**[J-103A-2019 and J-103B-2019] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 35 MAP 2018 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Montgomery County Court of |
| | : | Common Pleas, Criminal Division, at |
| v. | : | No. CP-46-CR-1445-1997. dated |
| | : | June 21, 2018 |
| | : | |
| CLAUDE LACOMBE, | : | ARGUED: November 20, 2019 |
| | : | |
| Appellee | : | |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 64 MAP 2018 |
| | : | |
| Appellant | : | Appeal from the Order of |
| | : | Montgomery County Court of |
| | : | Common Pleas, Criminal Division, at |
| v. | : | No. CP-46-CR-0004935-2013 dated |
| | : | October 26, 2018. |
| | : | |
| MICHAEL WITMAYER, | : | ARGUED: November 20, 2019 |
| | : | |
| Appellee | : | |

## CONCURRING AND DISSENTING OPINION

**JUSTICE WECHT**                                       **DECIDED: July 21, 2020**

In *Commonwealth v. Muniz*,[1] this Court determined that the regulatory scheme imposed upon certain sexual offenders by the Sex Offender Registration and Notification Act ("SORNA")[2] was punitive in effect, and, when imposed retroactively, violated the *Ex Post Facto* Clauses of both the United States Constitution and the Pennsylvania

---

[1]     164 A.3d 1189, 1193 (Pa. 2017) (plurality).

[2]     42 Pa.C.S. §§ 9799.10-9799.41.

Constitution.[3]  Shortly thereafter, the Pennsylvania Superior Court extended our *Muniz* rationale to invalidate SORNA's provisions governing the determination of whether a particular offender is a "sexually violent predator" ("SVP").[4]

In response, the General Assembly returned to the drawing board and enacted a new—albeit somewhat familiar—regulatory system, one purporting to remedy the constitutional defects that doomed the version of SORNA at issue in these two rulings. The new legislation bifurcated SORNA within the Sentencing Code into two distinct subchapters:  Subchapter H and Subchapter I.  Subchapter H governs offenders whose triggering crimes were committed on or after December 20, 2012. [5]  Subchapter I applies retroactively to those whose offenses occurred before that date.

Claude Lacombe and Michael Witmayer committed their crimes prior to December 20, 2012.  Both men are subject to the retroactive application of Subchapter I.  After both prevailed before the court of common pleas in their *ex post facto* challenges to the

---

[3]     The prohibition on *ex post facto* laws appears twice in the United States Constitution.  The first proscription  is found in Article 1, Section 9, and serves as a limitation on Congress' authority to pass laws:  "No Bill of Attainder or ex post facto Law shall be passed."  U.S. CONST. art. 1, § 9.  The limitation appears for the second time in Article 1, Section 10, and, in this usage, constitutes a restriction on the power of the states:  "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."  U.S. CONST. art. 1, § 10.

Pennsylvania's *ex post facto* provision is found in Article 1, Section 17 of our Constitution, and states that:  "No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed."  PA. CONST. art 1, § 17.

[4]     *Commonwealth v. Butler*, 173 A.3d 1212 (Pa. Super. 2017) ("*Butler I*"), *reversed by Commonwealth v. Butler*, 226 A.3d 972 (Pa. 2020) ("*Butler II*").

[5]     Subchapter H is not at issue in this case.  We consider a challenge to the constitutionality of that subchapter in *Commonwealth v. Torsilieri*, No. 37 MAP 2018.

application of this new scheme, the Commonwealth asked this Court[6] to evaluate the constitutionality of Subchapter I and to decide whether the statute must meet the same fate that befell SORNA in *Muniz*.

The Majority concludes that the PCRA court (and, hence, this Court on appeal) has jurisdiction to consider the complex legal issues presented in this case. *See* Maj. Op. at 20-21. I agree with that conclusion.

The Majority then proceeds to find no constitutional defect in Subchapter I. I do not agree with this determination. The General Assembly's alterations to the manner in which Pennsylvania regulates sexual offenders are insufficient to overcome the punitive nature of the scheme set forth in Subchapter I. To be sure, with the enactment of Subchapter I, the General Assembly moved incrementally in a constitutional direction. But close examination compels the conclusion that the amended statute does not go far enough to transform the punitive scheme into a regulatory one. Because Subchapter I remains punitive, and because it is mandated to apply retroactively, it must again be stricken as an unconstitutional *ex post facto* law. I respectfully dissent from the Majority's contrary conclusion.

## I. Relevant Legal History

The factual and procedural background of these two cases largely is immaterial to the legal issue presented herein, and the Majority ably outlines the most relevant aspects of that background.[7] The legal history that precedes these appeals is a different matter.

---

[6]     See 42 Pa.C.S. § 722(7) ("The Supreme Court shall have exclusive jurisdiction of appeals from final orders . . . [in m]atters where the court of common pleas has held invalid as repugnant to the Constitution, treaties or laws of the United States, or to the Constitution of this Commonwealth, any treaty or law of the United States or any provision of the Constitution of, or of any statute of, this Commonwealth, or any provision of any home rule charter.").

[7]     *See* Maj. Op. at 2-6.

In order to assess the constitutionality of Subchapter I, it first is necessary to review the principal aspects of the winding, interrelated history of Pennsylvania's sexual offender regulatory statutes and this Court's cases interpreting those statutes in light of the constitutional ban on *ex post facto* laws. That history is linked to, and lays the foundation for, my analysis of the legal issue presented here.

Our General Assembly enacted Pennsylvania's first version of Megan's Law in 1995, known since in this Commonwealth as "Megan's Law I." *See, e.g.*, *Commonwealth v. Lee*, 935 A.2d 865, 872 (Pa. 2007) (citing cases and statutory history of "Megan's Law"). The landmark legislation consisted of two principal components. One part governed convicted sexual offenders who were deemed to be SVPs, and the other part applied to those offenders who were not so designated. *See Commonwealth v. Donald Williams*, 733 A.2d 593, 595 (Pa. 1999) ("*Williams I*"). The obligations imposed upon an SVP under Megan's Law I differed substantially from those required of non-SVP offenders. In *Williams I*, we described those distinctions in detail:

> There is a distinct difference under [Megan's Law I] between the requirements and sanctions applicable to those persons who are classified as sexually violent predators and those who are not. Those offenders who are not classified as sexually violent predators are subject to the registration requirements set forth as Section 9793 of [Megan's Law I]. This provision requires that an offender register a current address with the Pennsylvania State Police upon release from incarceration, being placed on parole, the commencement of a sentence of intermediate punishment or probation, or under the parole board's supervision. The State Police must be notified of an offender's change of address and a current address must be registered. The period of registration under this provision is ten years and failure to comply with the provision is a felony of the third degree.
>
> If a person is classified as a sexually violent predator under [Megan's Law I], he or she is subjected to much broader registration and notification requirements. Specifically, [Megan's Law I] requires potentially lifetime registration of a current address with the State Police "unless the court determines the person is no longer a sexually violent predator." Verification of a current address is required every 90 days.

[Megan's Law I also] specifies that the crime victim of a sexually violent predator shall be given written notice when an offender registers an address initially, and when a change of address is provided. [The statute] provides for extensive public notification of the name, address, offense, designation and photograph of sexually violent predators. [It] specifies that notification of the foregoing information is to be given to the neighbors of sexually violent predators, the director of county child and youth services where the sexually violent predator resides, the superintendent of each school district in the area, including private and parochial schools, the director of licensed day care facilities in the municipality where the sexually violent predator resides and the president of any college, university and community college located within 1,000 feet of a sexually violent predator's residence.

In addition to the foregoing, [Megan's Law I] provides for enhanced punishment of sexually violent predators. Specifically, [Megan's Law I] provides that once a person is classified as a sexually violent predator, "the offender's maximum term of confinement for any offense or conviction . . . shall be increased to the offender's lifetime notwithstanding lesser statutory maximum penalties for these offenses." [The statute] requires sexually violent predators to attend monthly counseling sessions and . . . provides that

> [n]otwithstanding any other provision of law to the contrary, when a person who has been designated as a sexually violent predator is convicted of a subsequent sexually violent offense, the mandatory sentence shall be life imprisonment.

*Id.* at 595-96 (internal citations and footnotes omitted).

Understanding the critical significance of the SVP determination for purposes of Megan's Law I, we considered the constitutionality of the prescribed method by which an offender was so designated. *Id.* at 596. Megan's Law I set forth a list of sexual offenses that triggered the application of the statute's terms and conditions. *Id.* at 595. Once a person was convicted of any of these offenses, Megan's Law I directed courts to presume that the offender was an SVP. *Id.* at 596. A member of the "State Board to Assess Sexually Violent Predators" then was to conduct a pre-sentencing evaluation of the offender based upon a set of statutory criteria and render a written opinion as to whether the offender in fact met the definition of an SVP. Upon receipt and consideration of that report, the trial court was required to hold an evidentiary hearing. The offender bore the

burden to rebut—by clear and convincing evidence—the presumption that he or she was an SVP. Following consideration of the expert report and all of the evidence admitted at the hearing, the trial court then was required to determine whether the SVP presumption had been rebutted. If not, then the offender was deemed an SVP, which was to be noted by the trial court on the judgment of sentence. *Id.* at 596-97.

Ultimately, we held that this statutory paradigm denied offenders the procedural due process protections guaranteed by the Fourteenth Amendment to the United States Constitution. *Id.* at 608. To determine precisely what process was due to convicted offenders, we first had to ascertain whether Megan's Law I essentially was a criminal or civil statute. Central to this assessment was the enactment's provision that, once an offender was deemed an SVP, the statutory maximums for the crimes for which the SVP was convicted were extended to the offender's lifetime. Thus, the SVP determination in Megan's Law I constituted a "separate factual determination, the end result of which is the imposition of criminal punishment." *Id.* at 603. Accordingly, this Court found that Megan's Law I effectively was a sentencing statute, which entitled an offender to the "full panoply of the relevant protections which due process guarantees," *id.*, not the least of which were the presumption of innocence and the placement of the evidentiary burden upon the Commonwealth's shoulders. Because the statute failed to afford these constitutional minimums, we struck "all of the relevant provisions of [Megan's Law I] pertaining to sexually violent predators." *Id.* at 608.

The General Assembly responded to *Williams I* by passing Megan's Law II, which took effect in 2000. In *Commonwealth v. Gomer Williams*, 832 A.2d 962 (Pa. 2003) ("*Williams II*"), we weighed the constitutionality of the registration, notification, and counseling obligations imposed upon SVPs by Megan's Law II. Megan's Law II remedied many of the constitutional deficiencies that *Williams I* had identified in Megan's Law I.

Offenders no longer were presumed to be SVPs automatically upon conviction. The Commonwealth was assigned the burden to prove, by clear and convincing evidence, that the offender met the definition of an SVP. *Williams II*, 832 A.2d at 966. SVPs no longer were subjected to an automatic increase in their maximum sentences. *Id.* at 967. Nevertheless, SVPs were obligated to submit to, and participate in, a complex protocol requiring them to comply with registration, notification, and counseling requirements for the remainder of their lifetimes. Failure to comply resulted in additional criminal charges and penalties.

The specific constitutional question that we confronted in *Williams II* was whether these obligations imposed upon SVPs constituted criminal punishment so as to work an *ex post facto* violation. To evaluate these claims, we applied the two-part test that the Supreme Court of the United States outlined in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963).[8] Although we expressed a concern that Megan's Law II lacked a mechanism to afford judicial review of whether the SVP continued to pose a risk to society, we determined nonetheless that the *Mendoza-Martinez* test compelled the conclusion that

---

[8]    As I discuss in more detail below, the test requires first an inquiry into whether the legislature intended a statutory scheme to be punitive. If so, the inquiry ends. If not, the reviewing court must assess whether the statute nonetheless is punitive in its effect. This second inquiry requires consideration of the following seven factors:

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned[.]

*Mendoza-Martinez*, 372 U.S. at 168-69 (footnotes omitted).

the registration, notification, and counseling requirements imposed upon SVPs were not punitive. *Id.* at 986.[9]

In 2004, the General Assembly amended Megan's Law again, passing Megan's Law III. This enactment added several offenses to the list of triggering crimes and created a searchable computer database of convicted sexual offenders subject to Megan's Law registration. Megan's Law III also included provisions unrelated to sexual offender registration. In *Commonwealth v. Neiman*, 84 A.3d 603 (Pa. 2013), we struck down Megan's Law III as unconstitutional, as it was passed in violation of our Constitution's single subject rule. *See* PA. CONST. art. III, § 3 ("No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.").

Before we invalidated Megan's Law III in *Neiman*, SORNA had taken effect. SORNA instituted a number of changes that fundamentally altered both the way that sexual offenders were categorized and the obligations attendant to each designation. In *Muniz*, we explored the General Assembly's stated intent in enacting SORNA, as well as the parameters of the new regulatory scheme, as follows:

> The purposes of SORNA, as stated by the General Assembly, are as follows:
>
> > (1) To bring the Commonwealth into substantial compliance with the Adam Walsh Child Protection and Safety Act of 2006 . . .
> >
> > (2) To require individuals convicted or adjudicated delinquent of certain sexual offenses to register with the Pennsylvania State Police and to otherwise comply with this subchapter if

---

[9] *See also Muniz*, 164 A.3d at 1201-03 (detailing *Williams II*'s *ex post facto* analysis). In *Williams II*, this Court also considered whether the penalty for failure to comply with the terms and conditions of Megan's Law II—a possible life sentence—constituted punishment. *Williams II*, 832 A.2d at 985. We held that statutory sanction to be "unconstitutionally punitive, but severable." *Id.* at 987.

those individuals reside within this Commonwealth, intend to reside within this Commonwealth, attend an educational institution inside this Commonwealth or are employed or conduct volunteer work within this Commonwealth.

(3) To require individuals convicted or adjudicated delinquent of certain sexual offenses who fail to maintain a residence and are therefore homeless but can still be found within the borders of this Commonwealth to register with the Pennsylvania State Police.

(4) To require individuals who are currently subject to the criminal justice system of this Commonwealth as inmates, supervised with respect to probation or parole or registrants under this subchapter to register with the Pennsylvania State Police and to otherwise comply with this subchapter. To the extent practicable and consistent with the requirements of the Adam Walsh Child Protection and Safety Act of 2006, this subchapter shall be construed to maintain existing procedures regarding registration of sexual offenders who are subject to the criminal justice system of this Commonwealth.

(5) To provide a mechanism for members of the general public to obtain information about certain sexual offenders from a public Internet website and to include on that Internet website a feature which will allow a member of the public to enter a zip code or geographic radius and determine whether a sexual offender resides within that zip code or radius.

(6) To provide a mechanism for law enforcement entities within this Commonwealth to obtain information about certain sexual offenders and to allow law enforcement entities outside this Commonwealth, including those within the Federal Government, to obtain current information about certain sexual offenders.

42 Pa.C.S. § 9799.10. Furthermore, the General Assembly expressed the legislative findings and declaration of policy supporting SORNA as follows:

(a) **Legislative findings.**—The General Assembly finds as follows:

(1) In 1995 the General Assembly enacted the act of October 24, 1995 (1st Sp. Sess. P.L. 1079, No. 24), commonly referred to as Megan's Law. Through this enactment, the General Assembly intended to comply with legislation enacted by Congress requiring that states provide for the registration of sexual offenders. The Federal statute, the Jacob Wetterling

Crimes Against Children and Sexually Violent Offender Registration Act (Public Law 103–322, 42 U.S.C. [§] 14071 *et seq.*), has been superseded by the Adam Walsh Child Protection and Safety Act of 2006 (Public Law 190–248, 120 Stat. 587).

(2) This Commonwealth's laws regarding registration of sexual offenders need to be strengthened. The Adam Walsh Child Protection and Safety Act of 2006 provides a mechanism for the Commonwealth to increase its regulation of sexual offenders in a manner which is nonpunitive but offers an increased measure of protection to the citizens of this Commonwealth.

(3) If the public is provided adequate notice and information about sexual offenders, the community can develop constructive plans to prepare for the presence of sexual offenders in the community. This allows communities to meet with law enforcement to prepare and obtain information about the rights and responsibilities of the community and to provide education and counseling to residents, particularly children.

(4) Sexual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest.

(5) Sexual offenders have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government.

(6) Release of information about sexual offenders to public agencies and the general public will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems so long as the information released is rationally related to the furtherance of those goals.

(7) Knowledge of whether a person is a sexual offender could be a significant factor in protecting oneself and one's family members, or those in care of a group or community organization, from recidivist acts by such offenders.

(8) The technology afforded by the Internet and other modern electronic communication methods makes this information readily accessible to parents, minors, and private entities, enabling them to undertake appropriate remedial precautions to prevent or avoid placing potential victims at risk.

**(b) Declaration of policy.**— The General Assembly declares as follows:

(1) It is the intention of the General Assembly to substantially comply with the Adam Walsh Child Protection and Safety Act of 2006 and to further protect the safety and general welfare of the citizens of this Commonwealth by providing for increased regulation of sexual offenders, specifically as that regulation relates to registration of sexual offenders and community notification about sexual offenders.

(2) It is the policy of the Commonwealth to require the exchange of relevant information about sexual offenders among public agencies and officials and to authorize the release of necessary and relevant information about sexual offenders to members of the general public as a means of assuring public protection and shall not be construed as punitive.

(3) It is the intention of the General Assembly to address the Pennsylvania Supreme Court's decision in *Commonwealth v. Neiman*, [84 A.3d 603] (Pa. 2013), by amending this subchapter in the act of March 14, 2014 (P.L. 41, No. 19).

42 Pa.C.S. § 9799.11(a)–(b).

SORNA's registration provisions are applicable to, *inter alia*, the following individuals: (1) those convicted of a sexually violent offense, on or after the effective date of SORNA, who are residents of Pennsylvania, employed in Pennsylvania, students in Pennsylvania or transients; (2) those who are inmates, on or after the effective date of SORNA, in state or county prisons as a result of a conviction for a sexually violent offense; (3) those who, on or after the effective date of SORNA, are inmates in a federal prison or are supervised by federal probation authorities as a result of a sexually violent offense and have a residence in Pennsylvania, are employed in Pennsylvania, are students in Pennsylvania or transients; and, pertinent to this appeal, (4) those who were required to register under previous versions of Megan's Law and had not yet fulfilled their registration period as of the effective date of SORNA.  42 Pa.C.S. § 9799.13.

SORNA classifies offenders and their offenses into three tiers.  42 Pa.C.S. § 9799.14.  Those convicted of Tier I offenses are subject to registration for a period of fifteen years and are required to verify their registration information and be photographed, in person at an approved registration site, annually.  42 Pa.C.S. § 9799.15(a)(1), (e)(1).  Those convicted of Tier II offenses are subject to registration for a period of twenty-five years and are required to verify their registration information and be photographed, in person at an approved registration site, semi-annually.  42 Pa.C.S. § 9799.15(a)(2), (e)(2).

Those convicted of Tier III offenses are subject to lifetime registration and are required to verify their registration information and be photographed, in person at an approved registration site, quarterly. 42 Pa.C.S. § 9799.15(a)(3), (e)(3). The Tier III offenses enumerated in SORNA . . . are as follows:

(1) 18 Pa.C.S. § 2901(a.1) (relating to kidnapping).

(2) 18 Pa.C.S. § 3121 (relating to rape).

(3) 18 Pa.C.S. § 3122.1(b) (relating to statutory sexual assault).

(4) 18 Pa.C.S. § 3123 (relating to involuntary deviate sexual intercourse).

(5) 18 Pa.C.S. § 3124.1 (relating to sexual assault).

(6) 18 Pa.C.S. § 3124.2(a.1) [relating to institutional sexual assault].

(7) 18 Pa.C.S. § 3125 (relating to aggravated indecent assault).

(8) 18 Pa.C.S. § 3126(a)(7) (relating to indecent assault [of victim under 13 years of age]).

(9) 18 Pa.C.S. § 4302(b) (relating to incest).

(10) 18 U.S.C. § 2241 (relating to aggravated sexual abuse).

(11) 18 U.S.C. § 2242 (relating to sexual abuse).

(12) 18 U.S.C. § 2244 ([abusive sexual contact] where the victim is under 13 years of age).

(13) A comparable military offense or similar offense under the laws of another jurisdiction or foreign country or under a former law of this Commonwealth.

(14) An attempt, conspiracy or solicitation to commit an offense listed in paragraph (1), (2), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12) or (13).

(15) (Reserved).

(16) Two or more convictions of offenses listed as Tier I or Tier II sexual offenses.

42 Pa.C.S. § 9799.14(d).

SORNA also establishes a statewide registry of sexual offenders to be created and maintained by the state police. 42 Pa.C.S. § 9799.16(a). The registry contains information provided by the sexual offender, including: names and aliases, designations used by the offender for purposes of routing or self-identification in internet communications, telephone numbers, social security number, addresses, temporary habitat if a transient, temporary lodging information, passport and documents establishing immigration status, employment information, occupational and professional licensing information, student enrollment information, motor vehicle information, and date of birth. 42 Pa.C.S. § 9799.16(b). The registry also contains information from the state police, including the following: physical description of the offender, including a general physical description, tattoos, scars and other identifying marks, text of the statute defining the offense for which the offender is registered, criminal history information, current photograph, fingerprints, palm prints and a DNA sample from the offender, and a photocopy of the offender's driver's license or identification card. 42 Pa.C.S. § 9799.16(c).

Not only does SORNA establish a registry of sexual offenders, but it also directs the state police to make information available to the public through the internet. 42 Pa.C.S. § 9799.28. The resulting website "[c]ontains a feature to permit a member of the public to obtain relevant information for an [offender] by a query of the internet website based on search criteria including searches for any given zip code or geographic radius set by the user." 42 Pa.C.S. § 9799.28(a)(1)(i). The website also "[c]ontains a feature to allow a member of the public to receive electronic notification when [an offender] provides [updated] information [and also allows] a member of the public to receive electronic notification when [an offender] moves into or out of a geographic area chosen by the user." 42 Pa.C.S. § 9799.28(a)(1)(ii). The Pennsylvania website must coordinate with the Dru Sjodin National Sex Offender Public Internet Website (https://www.nsopw.gov) and must be updated within three business days of receipt of required information. 42 Pa.C.S. § 9799.28(a)(1)(iii), (iv).

In addition to the offender's duty to appear at an approved registration site annually, semi-annually, or quarterly, depending upon the tier of their offense, all offenders are also required to appear in person at an approved registration site within three business days of any changes to their registration information including a change of name, residence, employment, student status, telephone number, ownership of a motor vehicle, temporary lodging, e-mail address, and information related to professional licensing. 42 Pa.C.S. § 9799.15(g). Offenders must also appear in person at an approved registration site within twenty-one days in advance of traveling outside the United States and must provide dates of travel, destinations, and temporary lodging. 42 Pa.C.S. § 9799.15(i).

> Furthermore, transients, *i.e.* homeless individuals, must appear in person monthly until a residence is established.  42 Pa.C.S. § 9799.15(h)(1).  Offenders who fail to register, verify their information at the appropriate time, or provide accurate information are subject to prosecution and incarceration under 18 Pa.C.S. § 4915.1 (failure to comply with registration requirements).  42 Pa.C.S. § 9799.21(a).

*Muniz*, 164 A.3d at 1204-08 (footnotes omitted).

In *Muniz*, issued almost five years after SORNA took effect, we considered a challenge to the constitutionality of its retroactive application to persons whose offenses occurred prior to December 20, 2012.  Specifically, this Court "granted discretionary review to determine whether [SORNA], as applied retroactively . . . is unconstitutional under the *ex post facto* clauses of the United States and Pennsylvania Constitutions."  *Id.* at 1192.  A plurality of this Court determined that such application was unconstitutional under both charters.[10]

The Opinion Announcing the Judgment of the Court ("OAJC") in *Muniz* first examined the history of the constitutional proscription against *ex post facto* laws generally, which in part is premised upon the necessity of preventing governmental officials from passing "arbitrary or vindictive" legislation.  *Id.* at 1195 (citation omitted).  As well, the OAJC explained, prohibition of such laws is based not upon "an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was

---

[10]    In *Muniz*, I issued a concurring opinion joining the plurality's determination that the retroactive application of SORNA violated the Pennsylvania Constitution.  I did not join (because I would not have reached) the plurality's analysis of the issue under the United States Constitution or the plurality's conclusion that the Pennsylvania Constitution provides greater protections against *ex post facto* laws than does its federal counterpart.  *Muniz*, 164 A.3d at 1233 (Wecht, J., concurring).  Justice Todd joined my concurring opinion.  Chief Justice Saylor authored a dissenting opinion, and Justice Mundy did not participate in the resolution of the case.  Hence, a plurality decision resulted, there being no Majority with regard to the application of the *Mendoza-Martinez* criteria under federal law.

consummated." *Id.* (quoting *Weaver v. Graham*, 450 U.S. 24, 30 (1981)). To constitute an *ex post facto* criminal statute, the law must "be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it," *id.* at 1196 (quoting *Weaver*, 450 U.S. at 29). Further, such a law must be one of the following four types of criminal statutes:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

*Id.* at 1195 (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798)). Contemplating these standards, the OAJC in *Muniz* explained that, if SORNA constituted punishment, then the third *Calder* category of criminal statutes would be implicated, potentially resulting in an unconstitutional *ex post facto* statute. Thus, the inquiry necessarily turned upon whether SORNA constituted punishment, and upon the application of the two-part analytical test provided in *Mendoza-Martinez*.

After detailing the most relevant case law testing the constitutionality of sexual offender registration statutes, *see Muniz*, 164 A.3d at 1196-1203 (discussing *Smith v. Doe*, 538 U.S. 84 (2003), *Williams I*, and *Williams II*), the OAJC considered the first aspect of the *Mendoza-Martinez* model, inquiring whether the General Assembly, by enacting SORNA, intended to punish sexual offenders. The OAJC examined the statutory text, and found that none of that language exhibited a punitive intent. *Id.* at 1209. Rather, the "expressed purpose, legislative findings, [and] declaration of policy" all demonstrated the General Assembly's desire to enact a civil, regulatory scheme. *Id.* The OAJC expressed concern about some aspects of SORNA that facially undermined the General Assembly's

expressed non-punitive intent. *See id.* (finding troubling, *inter alia*, SORNA's: (1) inclusion within its net of a broad class of crimes some of which are minor and non-sexual in nature; (2) codification within the Crimes Code; and (3) vesting of regulatory authority with the Pennsylvania State Police). However, noting that the General Assembly is afforded considerable deference in this regard, and recognizing that SORNA in large part was enacted to comply with federal law, the OAJC concluded, as we did in *Williams II*, that the legislature's intent was "not to punish, but to promote public safety through a civil, regulatory scheme." *Id.* at 1210 (quoting *Williams II*, 832 A.2d at 972).

Having so determined, the OAJC turned its attention to the second aspect of the *Mendoza-Martinez* test, and evaluated the seven factors designed to aid a court in analyzing whether a "statutory scheme is nonetheless so punitive either in purpose or effect as to negate the legislature's non-punitive intent." *Williams II*, 832 A.2d at 971. The *Muniz* OAJC noted that only the "clearest proof" of the punitive effect of a law will overcome its non-punitive intent, and that we must examine the entirety of the statutory scheme in order to make this assessment. *Muniz*, 164 A.3d at 1208 (OAJC) (citations omitted).

The first *Mendoza-Martinez* factor contemplates whether the challenged statute imposes an affirmative disability or restraint upon a sexual offender. In *Smith*, the United States Supreme Court applied the *Mendoza-Martinez* factors to Alaska's sexual offender registration statute. *Smith*, 538 U.S. at 97 (explaining that the factors, which migrated from the Court's double jeopardy jurisprudence into *ex post facto* cases, provide a "useful framework," and are "useful guideposts," but are "neither exhaustive nor dispositive" (citations omitted)). As to this factor, the Supreme Court found that Alaska's statute did not involve an affirmative disability or restraint upon an individual, at least in part, because the enactment did not require the offender to make updates to registration information in

person. *Id.* at 101. SORNA, on the other hand, required each offender subject to its terms to make multiple in-person visits to registration sites during each year in which the offender is subject to SORNA. The OAJC explained that a Tier III offender would be required to report in person a minimum of one-hundred times over a twenty-five year period. Indeed, a requirement for still more reporting was possible inasmuch as SORNA extended the offender's reporting obligation to the duration of his lifetime. A "transient" person would be required to appear in person at least three hundred times over a twenty-five year period.[11] According to the OAJC, these in-person reporting obligations distinguished SORNA significantly from the scheme that the Supreme Court reviewed in *Smith*, and constituted "a direct restraint" upon sexual offenders. *Muniz*, 164 A.3d at 1211 (OAJC). This factor, the OAJC concluded, weighed in favor of finding SORNA to be punitive.

The OAJC next considered the second *Mendoza-Martinez* factor, assessing whether the sanction historically has been regarded as punishment. As to this factor, the OAJC focused upon two principal considerations: (1) whether the scheme at issue mimicked historical forms of public shaming; and (2) whether the scheme significantly resembled probationary sentences. As to the former, the *Smith* Court rejected the notion that public dissemination of personal information about the convicted sexual offender online paralleled the face-to-face humiliation or community expulsion that historically had been regarded as public shaming. The information being circulated, although carrying the potential for embarrassment and ostracism, was accurate and already available in the public domain. *Smith*, 538 U.S. at 98-99. That the information was made available online

---

[11] According to the version of SORNA at issue in *Muniz*, a "transient" is defined as a "sexual offender who does not have a residence but nevertheless resides in this Commonwealth in a temporary habitat or other temporary place of abode or dwelling, including, but not limited to, a homeless shelter or park." 42 Pa.C.S. § 9799.12 (formerly 42 Pa.C.S. § 9792 (expired)).

did not shake the Supreme Court's conclusion, because the information was posted for the protection of the public, was not placed online for the purpose of shaming the offender, and had to be sought out affirmatively by members of the public. *Id.* at 99. *Smith*, however, was decided in 2003; the OAJC explained that a different "technological environment" obtained at that time. *Muniz*, 164 A.3d at 1212 (OAJC). In this regard, the OAJC found "particular force" in a concurring opinion that Justice Donohue authored during her service as a Judge of the Superior Court. *Muniz*, 164 A.3d at 1212 (OAJC) (quoting *Commonwealth v. Perez*, 97 A.3d 747 (Pa. Super. 2014) (Donohue, J., concurring)). There, Judge, now-Justice, Donohue observed:

> The environment has changed significantly with the advancements in technology since the Supreme Court's 2003 decision in *Smith*. As of the most recent report by the United States Census Bureau, approximately 75 percent of households in the United States have internet access. Yesterday's face-to-face shaming punishment can now be accomplished online, and an individual's presence in cyberspace is omnipresent. The public internet website utilized by the Pennsylvania State Police broadcasts worldwide, for an extended period of time, the personal identification information of individuals who have served their "sentences." This exposes registrants to ostracism and harassment without any mechanism to prove rehabilitation—even through the clearest proof. In my opinion, the extended registration period and the worldwide dissemination of registrants' information authorized by SORNA now outweighs the public safety interest of the government so as to disallow a finding that it is merely regulatory.

*Perez*, 97 A.3d at 765-66 (Donohue, J., concurring).

Regarding sexual offender regulatory schemes and probationary sentences, the *Smith* Court found "some force" to the argument that the two bear strong similarities, but it ultimately held that Alaska's statute did not amount to probation inasmuch as it lacked the mandatory conditions almost universally associated with probationary sentences. *Smith*, 538 U.S. at 101. The *Muniz* OAJC held that SORNA is "materially different" from the Alaska statute in this regard. *Muniz*, 164 A.3d at 1212 (OAJC). The OAJC adopted

(with minor adjustments to account for Muniz' designation as a Tier III offender) then-

Judge, now Justice, Donohue's *Perez* insight:

> In contrast, the mandatory in-person verification requirement in Section 9799.15(e) not only creates an affirmative restraint upon [appellant], requiring him to appear at a designated facility a minimum of [100] times over the next 25 years[, extending for the remainder of his life,] as a Tier [III] offender, but also greatly resembles the periodic meetings with probation officers imposed on probationers. . . . [B]ecause SORNA differs significantly from the statute at issue in *Smith*, these disparities must be considered.

> In [*Williams II*,] the Pennsylvania Supreme Court found that probation has historically been considered a traditional form of punishment. *Williams* [*II*], 832 A.2d at 977. Probation entails a set of mandatory conditions imposed on an individual who has either been released after serving a prison sentence, or has been sentenced to probation in lieu of prison time. 42 Pa.C.S. § 9754. These conditions can include psychiatric treatment, limitations on travel, and notifying a probation officer when any change of employment or residency occurs. 42 Pa.C.S. § 9754(c). Probationers are also subject to incarceration for a violation of any condition of their probation. 42 Pa.C.S. § 9771.

> Like the conditions imposed on probationers, registrants under SORNA must notify the state police of a change in residence or employment. 42 Pa.C.S. § 9799.15(g). Offenders also face incarceration for any noncompliance with registration requirements. 42 Pa.C.S. § 9799.22(a). Furthermore, SORNA requires registrants who do not have a fixed place of work to provide "general travel routes and general areas where the individual works" in order to be in compliance. 42 Pa.C.S. § 9799.16. The Supreme Court in *Smith* stated that "[a] sex offender who fails to comply with the reporting requirement may be subjected to criminal prosecution for that failure, but any prosecution is a proceeding separate from the individual's offense." *Smith*, 538 U.S. at 101-02. However, violations for noncompliance with both probation and SORNA registration requirements are procedurally parallel. Both require further factual findings to determine whether a violation has actually occurred. 42 Pa.C.S. §§ 9771(d), 9799.21. Similarly, but for the original underlying offense, neither would be subject to the mandatory conditions from which the potential violation stems. The parallels between the SORNA registration requirements and probation lead me to conclude that factor two of the [*Mendoza-Martinez*] test leans towards a finding that SORNA is punitive.

*Perez*, 97 A.3d at 763-64 (Donohue, J. concurring) (bracketed material supplied by *Muniz*,

164 A.3d at 1213 (OAJC); some citations modified).

While deeming this factor to present a much closer case than the statute at issue in *Smith*, the OAJC ultimately was persuaded by Justice Donohue's *Perez* perspective, and determined that SORNA's publication provisions were comparable to public shaming and that the statute's mandatory conditions were akin to probation. Thus, like the first factor, this factor weighed in favor of a finding that SORNA was punitive in effect.

The fourth *Mendoza-Martinez* factor[12] inquires whether the challenged statute operates in a manner that promotes the traditional aims of punishment. The *Muniz* OAJC narrowed its analysis of this factor to scrutiny of two of those punitive goals: deterrence and retribution. Starting with the former, the OAJC acknowledged *Smith*'s caveat that "the mere presence of a deterrent purpose" does not render such sanctions "criminal." *Smith*, 538 U.S. at 102. SORNA, the OAJC concluded, carried much more than a "mere presence" of a deterrent effect; so much so, in fact, that the Commonwealth conceded such effect. *Muniz*, 164 A.3d at 1214-15 (OAJC). Unlike earlier versions of Megan's Law, many of the crimes that triggered application of SORNA were relatively minor, providing only for short prison sentences or even probation. Yet commission of those same less severe crimes—some that did not even contain a sexual element—resulted in at least fifteen years of registration. *Id.* at 1215 (highlighting, by way of example, the crime of interference with custody of children, 18 Pa.C.S. § 2904). As such, as to many of the offenses in question, "SORNA clearly aims at deterrence." *Id.*

Regarding retribution, neither the Supreme Court in *Smith* nor this Court in *Williams II* had found that sexual offender registration laws carry a retributive effect. Nonetheless, the *Muniz* OAJC noted the lack of extensive analysis on this point in either decision, and proceeded to determine that SORNA contained "much more" of a retributive

---

[12] Following the *Smith* Court's path through the *Mendoza-Martinez* factors, the OAJC found that factors three and five were of "little significance" to the inquiry and carried "little weight in the balance." *Muniz*, 164 A.3d at 1214, 1216.

effect than the statutes considered in those prior cases. *Id.* at 1216. SORNA authorized the release online of a significant amount of an offender's personal information, much more than the information that generally is available to the public following a criminal conviction. The online data included the offender's name, year of birth, residence address, school address, work address, photograph, physical description, vehicle license plate number and vehicle description. *Id.* at 1215-16. Compared to Megan's Law II as applied to SVPs and as contemplated in *Williams II*, "SORNA has increased the length of registration, contains mandatory in-person reporting requirements, and allows for more private information to be displayed online." *Id.* at 1216 (citation omitted). All told, the *Muniz* OAJC deemed inescapable the conclusion that SORNA served as a deterrent and was retributive in effect, both of which militated in favor of finding SORNA to be punitive overall.

The *Muniz* OAJC turned to the sixth factor: whether there exists an alternative purpose to which the statute rationally may be connected. Because it was undeniable that SORNA was enacted to protect the public from sexual offenders, and thus was rationally connected to public health and safety, the appellant in *Muniz* conceded that this factor weighed in favor of finding SORNA to be non-punitive. *Id.* at 1216. The OAJC agreed. However, in doing so, the OAJC took note of the debate over whether statutes such as SORNA generally are necessary to combat a higher rate of recidivism among sexual offenders, acknowledging that such a phenomenon is not held universally or uniformly to be correct. *Id.* at 1217. The OAJC pointed to studies that support the opposite conclusion. Nevertheless, such divergence did not alter the punitiveness calculus before the Court. Sifting through these complex societal issues falls within the General Assembly's bailiwick, and this Court defers to legislative choices in this regard, especially when no universal consensus exists. Thus, the OAJC concluded that SORNA

could be rationally connected to a purpose other than the infliction of punishment, *i.e.*, protection of the public, and that this factor accordingly weighed against a finding of punitiveness.

Having discerned an alternative statutory purpose, the *Muniz* OAJC proceeded to the final *Mendoza-Martinez* factor, which required it to ascertain whether SORNA was nonetheless excessive in relation to the statute's non-criminal objective. The OAJC found two principles from our case law to be particularly relevant here. First, in *Williams II*, in assessing Megan's Law II, this Court observed that: "if the Act's impression is likely to result in individuals being deemed sexually violent predators who in fact do not pose the type of risk to the community that the General Assembly sought to guard against, then the Act's provisions could be demonstrated to be excessive." *Williams II*, 832 A.2d at 983. Second, in *Lee*, this Court explained that "society has a significant interest in assuring that the classification scheme [of a sex offender registration law] is not over-inclusive." *Lee*, 935 A.2d at 883 (internal quotation marks and associated citation omitted; bracketed material supplied by the OAJC in *Muniz*, 164 A.3d at 1218). Both of these explications highlight the harm resulting from overbroad sexual offender registration schemes, a concern that the OAJC already found to be present and troublesome in SORNA. The OAJC explained: "we have already recognized [that] SORNA categorizes a broad range of individuals as sex offenders subject to its provisions, including those convicted of offenses that do not specifically relate to a sexual act." *Muniz*, 164 A.3d at 1218 (OAJC) (citations omitted). Consequently, SORNA's terms and obligations were "excessive and over-inclusive in relation to the statute's alternative assigned purposes of protecting the public from sexual offenders." *Id.*

All that remained for purposes of federal *ex post facto* analysis was for the OAJC to balance the relevant factors. Of the five factors that were assigned weight, the OAJC

found that four weighed in favor of finding the SORNA to be punitive in effect. Those four factors outweighed the lone non-punitive factor. Hence, the OAJC held, "the retroactive application of SORNA to [Muniz] violates the ex post facto clause of the United States Constitution." *Id.*

## II. Subchapter I

As the Majority notes, the General Assembly enacted Subchapter I in the wake of both our decision in *Muniz* and the Superior Court's decision in *Butler I*. *See* Maj. Op. at 17; 42 Pa.C.S. § 9799.51(b)(4). Subchapter I applies to sexual offenders whose crimes were committed between April 22, 1996 and December 20, 2012. The General Assembly pronounced that the statute "shall not be considered punitive." *Id.* § 9799.51(b)(2).

The Majority helpfully lists those provisions of Subchapter I—including the substantive differences from prior versions of SORNA and Megan's Law—that are most relevant to the present inquiry. *See* Maj. Op. at 17-19. That list is worth repeating here, as it informs my analysis of whether these changes suffice to overcome an *ex post facto* challenge:

- Subchapter I applies to those convicted of a sexually violent offense after April 22, 1996, but before December 20, 2012. 42 Pa.C.S. § 9799.52(1), (2).

- Generally, any person convicted of one of the triggering offenses must register either for a period of ten years or for life. 42 Pa.C.S. § 9799.55(a), (b). An offender designated to be an SVP must register for life. *Id.* § 9799.55(b)(3). As was the case in prior iterations of Megan's Law or SORNA, registration is mandatory and without exception, including in the event of a natural disaster. *Id.* § 9799.55(c).

- All offenders must submit to fingerprinting and photographing. 42 Pa.C.S. § 9799.54(b).

- An offender must notify the PSP within three days after the offender changes residences. 42 Pa.C.S. § 9799.56(a)(2).

- If the offender is homeless, he or she must, within three days of a change in registration information, provide the PSP with: (1) the location where he or she is sheltering temporarily; (2) a list of places where he or she eats, frequents, or engages in leisure activities; and (3) a list of any potential future destinations. 42 Pa.C.S. § 9799.57(2)(i)-(ii).

- Generally, failure to comply with the registration requirements results in a felony prosecution. 42 Pa.C.S. § 9799.60(e); 18 Pa.C.S. § 4915.2(b), (c).

- The subchapter also establishes a website to be operated in conjunction with the statewide registry. The website will publish the following information as to each offender: (1) name and known aliases; (2) year of birth; (3) the address, municipality, county, and zip code of any residence at which the offender lives; (4) the location of any schools attended by the offender; (5) the address of any employment location; (6) a photograph of the offender that must be updated at least once per year; (7) a physical description of the offender, including sex, height, weight, eye color, hair color, and race; (8) any identifying marks, including tattoos, scars, or birthmarks; (9) the license plate number and a description for any vehicle owned or registered to the offender; (10) a status report regarding whether the offender is compliant with the terms of SORNA; (11) an indication of whether the offender's victim was a minor; (12) a description of the offense committed by the offender; (13) the dates of the offense and conviction; and (14) the location of temporary shelter and where the offender receives mail, if the offender is homeless. 42 Pa.C.S. § 9799.63(c).

  For SVPs and lifetime reporters, the information will remain online for the duration of the offender's lifetime, unless the SVP or lifetime reporter is removed from the registry pursuant to 42 Pa.C.S. § 9799.59. For non-SVPs, the information is posted online for the entirety of the time that the offender is required to register. 42 Pa.C.S. § 9799.63(d)(1)-(3).

- If a member of the public so desires, the website will alert that person by electronic notification if an offender moves in or out of the geographic area designated by the person. 42 Pa.C.S. § 9799.63(b)(7).

- For in-person reporting for residence verification, a non-SVP must report in person once per year at an approved facility. 42 Pa.C.S. § 9799.60(b). The non-SVP offender must report annually on, or within ten days of, the anniversary of their initial registration. *Id.* An SVP must report in person four times per year. *Id.* § 9799.60(a).

- All offenders must contact the Pennsylvania State Police within three days of any change to their registration information, including changes to residence, employment, or education. However, Subchapter I contains no express requirement that the offender must appear in person to satisfy this obligation. 42 Pa.C.S. § 9799.56(a)(2).

- A homeless person living in a temporary habitation must report every thirty days. 42 Pa.C.S. § 9799.60(b.2).

- Finally, an SVP or lifetime reporter can petition a court to be removed from the statewide registry. At the time of the petition, the SVP must not have been convicted of any crime punishable by one year or longer after being released from prison or after registering for the first time, whichever is later, for a period of twenty-five years. Also, the offender must be reviewed by a member of the Sexual Offender Assessment Board. The SVP or lifetime reporter must demonstrate by clear and convincing evidence that he or she no longer poses a risk, or a threat of risk, to the public or any individual person. 42 Pa.C.S. § 9799.59(a).

- Persons convicted of the following crimes are subjected to a ten-year registration period: kidnapping, indecent assault, incest, prostitution, obscene and sexual materials, sexual abuse of children, unlawful contact with a minor, sexual exploitation of children, luring a child into a motor vehicle, and institutional sexual assault. 42 Pa.C.S. § 9799.55(a).

- Persons convicted of the following crimes, SVPs, and offenders convicted of two or more of the ten-year reporting crimes are subject to lifetime registration: rape, IDSI, sexual assault, aggravated indecent assault, and incest with a child under the age of 12. 42 Pa.C.S. § 9799.55(b).

- A number of crimes that were included in SORNA but are not necessarily sexually related were removed from the list of triggering offenses in Subchapter I, including, but not limited to, the following: unlawful restraint, false imprisonment, interference with custody of children, and invasion of privacy.

Maj. Op. at 17-19.

### III. Preliminary Procedural Issues

With this background in mind, there remains one procedural matter that must be considered before proceeding to the analytical task at hand. Lacombe and Witmayer

differed in the manner in which they sought relief in the lower courts. Witmayer filed a timely PCRA[13] petition, while Lacombe filed a petition to terminate his reporting and registration requirements. Neither the Commonwealth nor the Attorney General (the latter as an intervenor in this matter, *see* Pa.R.A.P. 521; 42 Pa.C.S. § 9799.74) challenge the propriety of Witmayer's pursuit of relief under the terms and time constraints of the PCRA. Both governmental parties, however, challenge the procedural propriety of the path chosen by Lacombe. Stated simply, both the Commonwealth and the Attorney General assert that Lacombe was required to pursue relief under the PCRA, including first satisfying one of the PCRA's time-bar exceptions. *See* Brief for the Commonwealth at 56-64; Brief for Intervenor Office of Attorney General at 46-48; 42 Pa.C.S. § 9545(b). Because Lacombe did not establish one of those exceptions, the Commonwealth and Attorney General argue, the trial court lacked jurisdiction to afford relief to Lacombe.

To date, as the Majority notes, *see* Maj. Op. at 20, this Court has not prescribed an exclusive procedural mechanism to challenge the constitutionality of sexual offender regulatory statutes.[14] The inherent difficulty in doing so arises from the fact that these statutes frequently are amended or overhauled, as I have shown above. There were multiple versions of Megan's Law, and Subchapter I is the second version of SORNA. Each version ushered in sweeping changes to the law, and each was applied retroactively. Offenders subject to one law commonly find themselves facing a new set of obligations for a much longer period of time than was originally imposed and to which they did not originally agree during plea negotiations. These circumstances present

---

[13] Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46.

[14] Because the Majority concludes that Subchapter I is not punitive, it declines to address this procedural quandary. *See* Maj. Op. at 33 n.16.

obvious procedural difficulties when an offender seeks to challenge increases in the severity of his or her conditions.

Over the years, we have entertained constitutional challenges arising in various postures. For instance, in *Commonwealth v. Martinez*, 147 A.3d 517 (Pa. 2016), three defendants challenged the increase in the duration of their obligations, which differed significantly from the terms reached during their plea negotiations. Like Lacombe, the three defendants did not file PCRA petitions; indeed, had they done so, their petitions would have been facially untimely. Instead, each of the three defendants filed a "Petition to Enforce Plea Agreement or for a Writ of Habeas Corpus." *Id.* at 523-24. Ultimately, this Court ruled in their favor, requiring enforcement of the plea bargains. Their choice of procedural mechanism was not fatal to their claims for relief.

In *Williams II*, Gomer Williams pursued relief via the filing of a "Motion for Extraordinary Relief." *Williams II*, 832 A.2d at 965. Another appellant in *Williams II*, Bruce Peters, filed a "Motion for Relief." *Id.* In *Muniz*, Jose Muniz argued in a post-sentence motion that he should not be subjected to SORNA, but instead should be required to comply with Megan's Law III, which was the law in place at the time of his commission of the triggering offenses and which required only a ten-year period of registration. *Muniz*, 164 A.3d at 1193. Then, on direct appeal, Muniz asserted that the retroactive application of SORNA to him was an *ex post facto* violation. *Id.*[15]

Nor are these the only options. Presumably, because the registry is maintained by the PSP, *see* 42 Pa.C.S. § 9799.67, an offender contesting the constitutionality of his or her inclusion on that registry, and seeking removal therefrom, could seek a *writ of mandamus* in the Commonwealth Court. *See id.* § 761 (establishing the original

---

[15] As noted, Witmayer chose to file a timely PCRA petition, which is not being contested on procedural grounds.

jurisdiction of the Commonwealth Court over matters involving governmental entities). Thus, it cannot be said that the PCRA is the only viable mechanism.

Moreover, for many offenders, the PCRA may not be available. To be eligible for relief, a PCRA petitioner must not only file timely; he or she also must be serving a sentence. *Id.* § 9543(a)(1). Many offenders will not begin their Subchapter I obligations until the completion of their sentences, and, for many other offenders, the compliance period will far exceed the length of their actual sentences. For this significant number of offenders, the PCRA is not an available avenue for relief. Moreover, to suggest that offenders subject to registration requirements must pursue their claims under the PCRA implicitly would suggest that such offenders are serving criminal sentences—a position manifestly undercutting the governmental parties' arguments that sexual offender registration requirements are non-punitive.

Our jurisprudence to date has not demanded any particular form of action, nor have we ever mandated compliance with the PCRA for such claims, as is evidenced by the different types of post-conviction claims that we have reviewed. The complexity and evolving nature of our sexual offender registry laws have made it difficult, and potentially inequitable, to prescribe any particular mechanism. For these reasons, I join the Majority's well-reasoned decision to decline the Commonwealth's and the Attorney General's invitation to bar Lacombe from pursuing relief on procedural grounds, and I join the Majority's concomitant finding of jurisdiction over the present cases. *See* Maj. Op. at 21.

## IV. *Ex Post Facto* Analysis

### A. Legislative Intent

*Ex post facto* analysis entails a two-part inquiry.[16]  The court must determine first whether, in enacting the challenged statute, the legislature intended to impose a punishment.  If so, then the statute is punitive, and unconstitutional if applied retroactively.  However, if the legislature intended to enact a civil regulatory scheme, then the court proceeds to the second prong of the inquiry, evaluating whether the law is punitive in effect so as to defeat the legislature's non-punitive intent.  *See Smith*, 538 U.S. at 92.

With regard to the first aspect of the inquiry, the only question is "whether the General Assembly's intent was to punish."  *Muniz*, 164 A.3d at 1209 (OAJC) (quoting *Williams II*, 832 A.2d at 971).  Here, the General Assembly did not intend to enact a punitive scheme.  That body expressly so stated in Subchapter I, declaring that the subchapter "shall not be construed as punitive." 42 Pa.C.S. § 9799.51(b)(2).  The General Assembly also stated that the purpose of the enactment was to "[p]rotect the safety and general welfare of the people of this Commonwealth by providing for registration, community notification and access to information regarding sexually violent predators and offenders who are about to be released from custody and will live in or near their neighborhood."  *Id.* § 9799.51(b)(1).  It is clear, then, that the General Assembly sought to enact a civil regulatory scheme.

### B.  The *Mendoza-Martinez* Factors

Having determined that Lacombe and Witmayer procedurally are not barred from challenging the constitutionality of the retroactive application of Subchapter I, and having concluded that the General Assembly did not specifically intend for the subchapter to constitute a penal scheme, I turn to the application of the *Mendoza-Martinez* factors.  Distilled to its essence, this task requires an examination of whether the alterations to

_____

[16]   As this is a question of law, our scope of review is plenary and our standard of review is *de novo.  Muniz*, 164 A.3d at 1195 (OAJC) (citation omitted).

SORNA that our General Assembly enacted in Subchapter I suffice to distance the present scheme from the unconstitutionally punitive version that we deemed to be an *ex post facto* law in *Muniz*.

i.      **Whether Subchapter I Imposes an Affirmative Disability or Restraint**

In *Muniz*, the OAJC held that this first factor weighed in favor of finding SORNA to be punitive. As described above, in finding that SORNA created an affirmative disability or restraint, the OAJC relied upon both the fact that the offender had to appear in person and (in larger part) upon the number of times that the offender was required to do so over the course of the period during which the offender was required to cooperate with SORNA's terms and conditions. *See Muniz*, 164 A.3d at 1210-11 (OAJC). For example, the OAJC explained, under the contested version of SORNA, a Tier III offender such as Muniz (and Lacombe and Witmayer) was required to report in person four times per year. Extrapolated over a period of twenty-five years, the *Muniz* OAJC highlighted, the offender would be required to make no fewer than one hundred in-person reporting visits to the Pennsylvania State Police ("PSP"). That number, moreover, represented the bare minimum: offenders might opt to make "free" choices to change residence or appearance, thereby requiring additional in-person reports to the PSP. *Id.* at 1211. The OAJC distinguished this statutory obligation imposed on Tier III offenders from the statute that the Supreme Court found to be constitutional in *Smith*, which required no in-person visits, and from Megan's Law II, which contained in-person counseling requirements for SVPs that we upheld in *Williams II* based upon the particular interests attendant to the SVP designation. *Id.* at 1210-11.

I discern no convincing reason to deviate from *Muniz* on this factor. Subchapter I continues to impose in-person reporting requirements upon sexual offenders. As Tier III offenders, Lacombe and Witmayer personally must appear to be photographed and to

complete registration paperwork once per year at an approved facility on or within ten days of the anniversaries of their initial registrations. 42 Pa.C.S. § 9799.60(b). Offenders also are required to alert the PSP within three days of any changes in registration-related circumstances (education, employment, residency, etc.). *Id.* § 9799.56(a)(2). Subchapter I does not state how an offender must complete this obligation. The statute does not expressly provide that this must be done in person, but it also does not prescribe any other mandatory method. Thus, there exists at least the possibility that the authorities will construe these requirements consistently with the older versions of the statutory scheme, which required offenders to appear in person in order to report any "free choices" to change their circumstances, *see Muniz*, 164 A.3d at 1211 (OAJC), thus increasing the required number of in-person appearances.

It is, of course, undeniable that Subchapter I decreases the number of required personal appearances that the *Muniz* OAJC found to be problematic. Over the same twenty-five-year period that the OAJC in *Muniz* used to highlight the extent of the burden on a sexual offender's life, that minimum number would drop from one hundred to twenty-five such appearances. Twenty-five is not an insignificant number of reporting visits, such that the in-person reporting requirements could be deemed categorically to impose no affirmative disability or restraint. Nor is the sheer *number* of appearances the only factor to be considered. As noted, in *Muniz*, the OAJC also found the mere obligation to appear in person to be a controlling feature for this *Mendoza-Martinez* factor, as exemplified by the OAJC's distinction of *Smith* upon the basis that SORNA had in-person requirements while the Alaska statute at issue in *Smith* did not. *Muniz*, 164 A.3d at 1210 (OAJC) (citing *Smith*, 538 U.S. at 102) (finding the "distinction" with regard to the presence of in-person obligations to be "important").

The Majority agrees with the Commonwealth that Subchapter I does not impose an affirmative disability or restraint upon retroactive offenders at all. *See* Maj. Op. at 21. The Majority reaches this conclusion almost exclusively because, with the enactment of Subchapter I, the number of in-person visits has decreased in significant measure. The Majority correctly notes that, over the course of a theoretical twenty-five year period, a sexual offender now must appear in person at least twenty-five times instead of at least one-hundred times. I disagree on the import and effect of this reduction.

The Majority views the reduction as a total removal of the disability and restraint imposed upon the offender. But a reduction is not the same as an elimination. The sheer number of times that a person must report in person cannot be the defining criterion for this factor. The disability or restraint is the obligation to remove oneself from one's daily life and to report to the governmental authority. A law that requires a person to take such action necessarily imposes a disability or restraint upon the person. The existence of the obligation to report in person, regardless of the number of reporting visits required, makes it inevitable that the first *Mendoza-Martinez* factor has been satisfied, and weighs in favor of finding the overall statute to be punitive. The Majority's contrary focus upon the infrequency of in-person visits more appropriately should impact the *weight* to be assigned to this factor in the *final* balancing of the factors. It cannot, and should not, affect the prior assessment of whether the statute imposes a disability or restraint, *vel non*, upon the offender.[17] Clearly, such imposition is manifest.

---

[17] The Majority takes issue with my position that the necessity and frequency of in-person reporting should affect only the weight assigned to the factor, and should not impact upon the question of whether the factor is established in the first instance. *See* Maj. Op. at 24. I stress that the *Mendoza-Martinez* factor at issue asks only whether the statutory scheme being considered "involves an affirmative disability or restraint." *Mendoza-Martinez*, 372 U.S. at 168-69. The factor does not inquire whether there *should be* a disability or restraint, whether such restrictions are "necessary to maintain a current registry," *see* Maj. Op. at 24 n.12, or even whether such impositions are a good idea. The

Moreover, the Majority's focus upon the frequency of the in-person appearances would require a complicated and elusive line-drawing exercise for future enactments. The Majority offers no guidance as to where (if at all) that line ultimately must be drawn. If one yearly in-person appearance is not a disability, but, per *Muniz*, four times every year is, what about two? What about three?[18] This framework unnecessarily and arbitrarily puts too much emphasis on frequency, whereas the simple legislative command to appear and report in person to the PSP suffices to establish a disability or restraint.

The Majority's declaration that the in-person reporting obligations are "minimal and clearly necessary" misses the point. Neither the reason for the requirement nor the level of intrusion is relevant to the question of whether the statute imposes an affirmative duty or restraint. The question is "does it restrain or disable the person," not "is it a good idea to restrain or disable the person," or "how much of a restraint or disability does the statute impose?" The latter questions fairly may impact the weight that should be assigned to

---

question simply is whether the scheme in operation "involves" a disability or restraint. To require a person to appear, in-person, at an authorized law enforcement facility is to impose a disability or restraint. That the requirement is wise or necessary is a matter more relevant to the weight the factor carries, not whether the factor is implicated in the first instance.

[18] The Majority avoids responding to this point, declaring simply that these matters are not presently before the Court. *See* Maj. Op. at 24 n.12. In this regard, the Majority's opinion raises more questions than it answers. The Majority's focus upon the frequency of (and need for) in-person reporting needlessly consigns the law to a state of flux. Suppose that lawmakers choose to increase the number of in-person appearances above what is required by Subchapter I, but below what we found problematic in *Muniz*. The lawmakers, and the public for that matter, are entitled to know the effect of our decisions. Although these questions are fairly derivative of the Majority's own analysis, it nonetheless declines to answer them. These questions would not arise if the Court would hold, as I would, that any compulsory and sanction-backed in-person appearance to the PSP constitutes an affirmative disability or restraint, and that the frequency and necessity of such appearances are matters for the weighing aspect of the analysis, rather than for its applicability *vel non*.

the factor, but they have little, if any, relevance as to whether the factor is met in the first instance.

Although the affirmative disability or restraint upon offenders under Subchapter I undoubtedly is less onerous than under the previous version of SORNA, it nonetheless remains an affirmative disability or restraint. Accordingly, I find that this factor weighs in favor of finding Subchapter I to be punitive in effect.

### ii. Whether the Operation of Subchapter I is Consistent With What Has Historically Been Regarded as Punishment

Quoting extensively from *Muniz*, the Majority finds that this factor weighs in favor of finding Subchapter I to be punitive. *See* Maj. Op. at 23-26 (quoting *Muniz*, 164 A.3d at 1212-13 (OAJC)). I agree with the Majority's assessment. I add the following thoughts.

Historically, contemplation of this factor has revolved around whether the operation of the statute at issue amounts to something akin to colonial shaming punishments or resembles criminal probation. I consider each in turn.

In *Smith*, the United States Supreme Court held that Alaska's statutory requirement that certain identifying and personal information about the sexual offender be disseminated to the public on the internet could not considered to be the equivalent of the face-to-face shaming employed in colonial America to punish similar offenders. *Smith*, 538 U.S. at 98-99. The online information, the Supreme Court held, was accurate, was already available to the public, and was accessed online only when a member of the public affirmatively sought it out. *Id.* at 99. In *Muniz*, the OAJC distinguished the Supreme Court's analysis, relying almost entirely upon Justice Donohue's concurrence in *Perez*. There, she explained (and the OAJC agreed) that the influence of technology on modern society had expanded significantly since *Smith* was decided, to the point that three-fourths of Americans had internet access in the home and the internet's involvement in

one's life is "omnipresent." *Muniz*, 164 A.3d at 1212 (OAJC) (citing *Perez*, 97 A.3d at 765-66 (Donohue, J., concurring)). The avenues available for harassment and ostracism of sexual offenders that most commonly are associated with public shaming are ever-present and immediately available in a substantial majority of American homes.

Online access and usage has only increased in the three years since *Muniz*. The face-to-face shaming that Justice Donohue explained could be accomplished online in over three-fourths of American homes when she concurred in *Perez* six years ago now can be accomplished on the "smart" devices carried by nearly every American. *See Riley v. California*, 573 U.S. 373, 385 (2014) ("A smart phone of the sort taken from Riley was unheard of ten years ago; a significant majority of American adults now own such phones."); *id.* at 395 ("According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower."). With a few quick clicks, nearly anyone can access the sexual offender website and obtain no fewer than fourteen different pieces of personal or identifying information on any offender. *See* 42 Pa.C.S. § 9799.63(c).

This is not at all to suggest that access to the information is an unimportant item in the General Assembly's toolbox as it seeks to protect the public from the harms that the legislature determined are associated with sexual offenders. *Id.* § 9799.63(a). However, the prevalence of the internet, the ease of access, and the amount of information posted on the website "now outweigh[] the public safety interest of the government so as to disallow a finding that [it] is merely regulatory." *Perez*, 97 A.3d at 766 (Donohue, J., concurring). This conclusion further is supported by the fact that Subchapter I directs the PSP to develop, implement, and maintain a mechanism on the website that provides automatic updates to any member of the public when an offender moves into or out of a locale. 42 Pa.C.S. § 9799.63(b)(7). Unlike the circumstance emphasized in *Smith*,

members of the public need not affirmatively seek out this personal information; it can be sent to them automatically.

Regarding the similarity between SORNA and probation, the *Muniz* OAJC again adopted Justice Donohue's concurrence in *Perez*. Therein, Justice Donohue compared the in-person reporting requirements imposed upon sexual offenders with meetings held between probationers and their probation officers. She further outlined the parallels between the conditions attendant to probation and those imposed upon sexual offenders under SORNA, noting that both require notification of authorities as to changes in residency or employment, both impose limitations upon movement or travel, and both result in further punishment upon non-compliance. *Perez*, 97 A.3d at 763-64 (Donohue, J., concurring). These striking similarities led the *Muniz* OAJC to conclude that SORNA's mandatory conditions are "more akin to probation." *Muniz*, 164 A.3d at 1213 (OAJC).

The enactment of Subchapter I has changed nothing that compels me to reach an opposite conclusion now. Subchapter I still requires in-person meetings, still imposes limits analogous to those levied upon probationers, and still imposes additional punishment in the event of non-compliance. As to the non-compliance, it bears emphasizing here that, with regard to assessing whether the statutory scheme resembles traditional punishment, Subchapter I could result in a penalty much more severe than that attendant to a violation of probation.

By way of example, consider a person convicted of indecent assault, 18 Pa.C.S. § 3126, graded in this instance as a first-degree misdemeanor. *Id.* § 3126(b)(2). The maximum penalty for an offense so graded is five years in prison. *Id.* § 106(b)(6). If that person is placed on probation for that crime, and then violates the probation, he or she will be subject to revocation of probation and will be resentenced, potentially to a new term of probation or perhaps to a term of incarceration. Regardless of how many times

the person violates probation or is resentenced, he or she can never be sentenced to a sum total of more than five years for that particular offense. *See* 42 Pa.C.S. § 9754(a) (a term of probation "may not exceed the maximum term for which the defendant could be confined").

Concomitant with probation, that same person must comply with the terms and obligations imposed upon him or her by Subchapter I. *Id.* § 9799.54(a)(3). Notably, if that person fails to comply with the registration and verification requirements of the subchapter, the punishment is an entirely new offense, graded as at least a third-degree felony, which, in my hypothetical, is a more severe crime than that which landed the offender within the ambit of Subchapter I in the first place. *Id.* § 9799.60(e); 18 Pa.C.S. § 4915.2. Consequently, for the person convicted of first-degree misdemeanor indecent assault, he or she later could face an entirely separate seven-year prison term, over and above any punishment imposed for a violation of probation. *See* 18 Pa.C.S. § 106(b)(4). Because the ultimate objective presently is to ascertain whether Subchapter I is punitive, the fact that the requirements of Subchapter I not only closely resemble probation but actually expose the offender to additional, and in many instances more severe, criminal punishment weighs heavily in favor of a finding of punitiveness. Thus, like the Majority, I conclude that Subchapter I is "comparable to shaming punishments" and "is more akin to probation," *Muniz*, 164 A.3d at 1213 (OAJC), militating in favor of a conclusion that Subchapter I is punitive in effect.

### iii. Whether the Statute Comes Into Play Only on a Finding of *Scienter*

As was the case in *Muniz,* and as explained aptly therein, "this factor is of little significance in our inquiry." *Id.* at 1214. Simply put, because it is clear that sexual offender statutes are aimed at protecting the public from recidivism, "past criminal conduct is 'a necessary beginning point.'" *Id.* (quoting *Smith*, 538 U.S. at 105).

### iv. Whether Subchapter I's Operation Will Promote the Traditional Aims of Punishment—Deterrence and Retribution

The Majority concludes that, although this factor weighs in favor of finding Subchapter I to be punitive, it nonetheless warrants less weight in the overall balance than it was given in *Muniz*, because (the Majority finds) the statute is aimed only at retribution but not at deterrence. *See* Maj. Op. at 28-29. I disagree inasmuch as I find ample evidence that Subchapter I seeks to advance both of these traditional aims of punishment.

The Majority rests the entirety of its analysis rejecting the presence of a deterrent effect upon the premise that, because Subchapter I applies retroactively, an offender cannot be deterred from engaging in an act that he or she already has committed. *Id.* at 28. The Majority cites nothing for this limited view of deterrence. Perhaps this is because there is nothing in Subchapter I that indicates that the General Assembly did not want to prevent sexual offenders from committing additional crimes in the future upon release from prison. Nor does the Majority account for the General Assembly's obvious desire to deter offenders from flouting the terms and obligations imposed upon them, a failure which would constitute a new criminal offense, a patent indicator of deterrent effect. Finally, the Majority's disregard of the deterrent effect is inconsistent with the framework that the OAJC outlined in *Muniz*. There, the OAJC agreed with the parties that "the prospect of being labeled a sex offender accompanied by registration requirements and the public dissemination of an offender's personal information over the internet has a deterrent effect." *Muniz*, 164 A.3d at 1215 (OAJC).[19] However, the OAJC also

---

[19] The Majority asserts that my reliance here upon this statement from *Muniz* undermines my position that the Majority takes an unduly limited view of deterrence. I disagree. We should take a robust view of the deterrent effect that Subchapter I has on offenders and potential offenders alike. The statute deters people from committing triggering offenses, from violating the terms and conditions of the obligations imposed after the initial conviction, from committing offenses or behaviors that would disqualify

recognized that the mere presence of a deterrent effect is not enough to render the entire statutory scheme punitive. In SORNA, conversely, the OAJC found more than a mere presence of such effect, in large part because many of the crimes that prompted the registration requirements were minor and did not command a lengthy prison sentence. For many of those offenses, SORNA's requirements far exceeded the amount of time the offender would be serving an actual sentence for the crime. This convinced the *Muniz* OAJC that "SORNA clearly aims at deterrence." *Id.*

Although much has changed with the enactment of Subchapter I, the result of the analysis is the same. One of the most obvious differences between Subchapter I and SORNA is the number of crimes to which the statute applies. Subchapter I removed the minor, non-sexual related crimes that the OAJC found problematic in its *Mendoza-Martinez* analysis. *See id.* at 1218. Nonetheless, utilizing the same framework as the OAJC in *Muniz*, the same imbalance appears with respect to a number of the crimes that require compliance under Subchapter I. For instance, pursuant to 42 Pa.C.S. § 9799.55(a), persons convicted of indecent assault graded as a first-degree misdemeanor (18 Pa.C.S. § 3126), promoting prostitution of a child (*id.* § 5902(b), (b.1)), obscene and other sexual materials or performances involving a child (*id.* § 5903(a)(3)-(6)), or sexual abuse of children (*id.* § 6312) must register for a period of ten years. However, indecent assault when graded as a first-degree misdemeanor, carries a maximum penalty of five years, *id.* § 106(b)(6), and the other listed crimes (at least for first offenses) are third-degree felonies, which carry a maximum penalty of seven years. *See id.* § 106(b)(4). As was the case in *Muniz*, a conviction for any one of these offenses, even the third-degree

---

them from the benefit of the removal mechanism, and perhaps more. *Muniz* concerned only the prospect of becoming a registered sexual offender. This indeed is one aspect of deterrence. But there is more to be considered. The Majority takes too narrow a view of the issue at hand.

felonies, does not guarantee a statutory maximum prison sentence, or even any period of incarceration at all. And even if the convicted offender was imprisoned for the maximum term for these offenses, the period of registration required of that offender upon release still would exceed the length of the prison term by at least three years. Inasmuch as the driving force behind the *Muniz* OAJC's contemplation of this factor was the potential disparity between the length of the imposed sentence and the length of registration, the same concern exists with Subchapter I with respect to a number of offenses. The continuing disparity militates once more in favor of finding that the statutory scheme is aimed at deterrence.[20] But there is more.

As I noted earlier, Subchapter I imposes significant penalties for failure to comply with its requirements. An offender who fails to comply with the registration requirements can be charged, convicted, and sentenced for at least a third-degree felony, which for many is an offense graded higher than, or equal to, the original offense that subjected him or her to registration. *See* 42 Pa.C.S. § 9799.60(e); 18 Pa.C.S. § 4915.2. Even for those convicted of more serious offenses, the prospect of another criminal offense and a certain return to prison serves a significant deterrent purpose.

Perhaps the most significant change ushered in by Subchapter I is the addition of a mechanism by which an offender can petition the court to be removed from the sexual offender registry and from its reporting requirements. *See* 42 Pa.C.S. § 9799.59. In order

---

[20] This differs significantly from this Court's analysis in *Williams II*. In that case, the focus exclusively was upon Megan's Law II's SVP provisions. Thus, for purposes of deterrence and retribution, our analysis hinged upon the fact that the incarceration which likely would result from a conviction of a crime that would lead to an SVP designation would be "substantial." *Williams II*, 832 A.2d at 978. In light of the severity of the likely punishment, we held, "it is unlikely that the prospect of subsequent registration, notification, and counseling will have any marginal deterrent effect upon [an SVP.]" *Id.* Here, as was the case in *Muniz*, the SVP provisions are not our focus, and I instead consider the statutory scheme as a whole, including those provisions that create the imbalance that prompted the *Muniz* OAJC to find a clear deterrent effect.

to petition for removal, the offender must, for a period of twenty-five years since the offender's release from prison or from his or her last criminal conviction, not have been convicted of any offense punishable by one year or more. *Id.* § 9799.59(a)(1). Undeniably, whether intended or not, this provision creates a great incentive for the offender to avoid lapsing back into criminal activity. For individuals like Lacombe and Witmayer, who are subjected to lifetime registration because of their IDSI convictions, the opportunity to decrease their registration period is a strong incentive to remain crime-free. This serves the General Assembly's intent to discourage recidivism. For precisely that reason, the prospect of losing one's opportunity to discontinue registration requirements serves as a considerable deterrent to the commission of additional crimes—a traditional aim of criminal punishment.

The Majority declines to consider the impact that the removal mechanism has on the deterrent nature of Subchapter I, because "this provision clearly does not deter the initial criminal activity." *See* Maj. Op. at 29. I find no compelling basis to limit a review of this factor to considerations that deter the crimes that subject an offender to Subchapter I in the first instance. I have found no statutory support for such a constraint, and the Majority cites none. To the contrary, this Court has explained, most recently in *Muniz*, *see* 164 A.3d at 1218 (OAJC), that, when contemplating the *Mendoza-Martinez* factors, a court must evaluate the entire statutory scheme, which necessarily includes provisions directed at deterring future misbehavior. Second, even if the inquiry were so narrow, the removal mechanism, and its high standards, unequivocally are relevant to a deterrence analysis. If the question is whether the terms and conditions of a sexual registration statute are so onerous and oppressive as to deter individuals from committing crimes, then surely it also matters that the mechanism by which one could obtain release from

those statutory obligations requires a very formidable level of proof. It is all part of the same package, and it must be considered as such.

Taken together, the potential imbalance between criminal punishment and the registration period, the severity of punishment for failure to comply, and the loss of an opportunity to be removed from the registry all signify that Subchapter I "clearly aims at deterrence." *Id.* at 1215.

As to retribution, the *Muniz* OAJC found that SORNA, via its predication upon a criminal offense, mandatory in-person reporting requirements, lengthy registration terms, and extensive personal and identifying information posted on the internet for public consumption, was much more retributive than either the Alaska statute at issue in *Smith* or Megan's Law II at issue in *Williams II*. Although it contains minor differences, Subchapter I continues to be predicated upon a criminal conviction, requires in-person reporting visits to the PSP, and mandates periods of registration of at least ten years and as long as an offender's lifetime. I see no reason now to deviate from the *Muniz* OAJC's determination in this regard, and neither does the Majority. *See* Maj. Op. at 28. Thus, Subchapter I also is retributive in nature. For these reasons, I would hold that the statutory scheme serves both traditional aims of punishment, resulting in this factor also weighing strongly in favor of an overall finding that the statutory scheme is punitive.

### v. Whether the Behavior to Which Subchapter I Applies Already is a Crime

As with the third factor, and consistent with *Muniz*, this factor "carries little weight in the balance." *Muniz*, 164 A.3d at 1216 (OAJC).

### vi. Whether an Alternative Purpose to Which Subchapter I May Rationally Be Connected is Assignable for It.

This factor requires little analysis. In enacting Subchapter I, the General Assembly declared that the purpose of the subchapter is to "[p]rotect the safety and general welfare

of the people of this Commonwealth by providing for registration, community notification and access to information regarding sexually violent predators and offenders who are about to be released from custody and will live in or near their neighborhood." 42 Pa.C.S. § 9799.51(b)(1). This purpose derives from the General Assembly's policy-based judgments. In this regard, the General Assembly has determined that the provisions of the statute are necessary to provide the community with "adequate notice and information about sexually violent predators and offenders . . . [so as to] develop constructive plans to prepare itself for the release of sexually violent predators and offenders." *Id.* § 9799.51(a)(1). Further, the legislative body concluded that "sexually violent predators and offenders pose a high risk of engaging in further offenses even after being released from incarceration or commitments, and protection of the public from this type of offender is a paramount governmental interest." *Id.* § 9799.51(a)(2).

Thus, like its predecessor, Subchapter I serves a purpose other than punishment to which the statute reasonably can be connected: to protect and inform the public regarding dangers ascertained by the General Assembly. This factor clearly weighs in favor of finding the statute to be non-punitive.

### vii. Whether Subchapter I Appears Excessive in Relation to the Alternative Purpose Assigned

When finding that SORNA was excessive in relation to its non-punitive purpose, the *Muniz* OAJC found relevant this Court's admonitions in *Williams II* and *Lee*. In *Williams II*, we cautioned that, "if the Act's imprecision is likely to result in individuals being deemed sexually violent predators who in fact do not pose the type of risk to the community that the General Assembly sought to guard against, then the Act's provisions could be demonstrated to be excessive." *Muniz*, 164 A.3d at 1218 (OAJC) (quoting *Williams II*, 832 A.2d at 983). In *Lee*, we emphasized that "society has a significant interest in assuring that the classification scheme [of a sex offender registration law] is

not over-inclusive." *Id.* (quoting *Lee*, 935 A.2d at 883) (brackets in original). Because of SORNA's inclusion of a wide array of offenses, some of which did not require the commission of sexual acts, the *Muniz* OAJC found that the concerns of both *Williams II* and *Lee* had come to fruition, rendering SORNA's regulatory scheme excessive in relation to its goals. *Id.*

With Subchapter I, the General Assembly removed most, if not all, of the non-sexual offenses that drove the *Muniz* OAJC's excessiveness determination. This mitigates the over-inclusiveness difficulty to a considerable extent. Although this undoubtedly is now a much closer case, the General Assembly's revisions do not necessarily mean that Subchapter I is not excessive in relation to its goals.

Subchapter I still governs an array of offenses, ranging from misdemeanors to first-degree felonies. Once an offender is subject to the subchapter's governance, the obligations and impact upon him or her are onerous and undeniable. For a non-SVP offender like Lacombe and Witmayer, an annual in-person report to the PSP is required for completion of registration paperwork and for photography. The offender promptly must report changes to the same authorities, and extensive information is posted online concerning the offender's likeness, vehicle, residence, etc. The threat of a separate felony prosecution (accompanied by likely imprisonment) for failure to comply looms over the offender for the duration of his or her registration period, and possibly for a lifetime. The duration of the obligations ranges from ten years to a lifetime, and, as I explained above, can exceed the punishments meted out for the actual crime that the offender committed. All told, Subchapter I creates a formidable web of restraints and obligations, erects hurdles in an offender's path to seeking and holding gainful employment, and exposes the offender to harassment and ostracism.

I do not for a moment disregard or demean the General Assembly's non-punitive goals. Nonetheless, this close call must fall in favor of finding the statutory scheme to be excessive. The entirety of the subchapter's obligations functionally dominate the offender's existence, and surpass that which is necessary to achieve the non-punitive legislative aims.

To be sure, much of Subchapter I resembles closely the statutory scheme that we found to be constitutional in *Williams II*. However, it is essential to recall that, in that case, this Court evaluated Megan's Law II as it applied to SVPs only. Regulation of SVPs begins with an individualized assessment of the offender and a specific legal determination that he or she suffers from a diagnosable mental abnormality that likely will cause the offender to commit additional predatory and violent sexual crimes in the future. *See* 42 Pa.C.S. § 9799.53. That initial determination fundamentally alters the offender's obligations, including the addition of in-person counseling requirements. Perhaps more relevant here, the individualized determination influences how courts analyze the *Mendoza-Martinez* factors, including the excessiveness consideration, and impacts consideration of the necessity of the imposition of the terms and conditions of sexual offender regulatory schemes. Accordingly, we consistently have upheld such schemes when imposed upon SVPs.[21] Here, the focus is not merely upon SVPs, but rather upon "[Subchapter I's] entire statutory scheme." *Muniz*, 164 A.3d at 1218 (OAJC). In this context, I am compelled find Subchapter I to be excessive, even if not overwhelmingly so.

There is another aspect of Subchapter I that impacts this assessment: the removal mechanism. In *Williams II*, this Court expressed the belief that a "reasonable argument could be made that, to avoid excessiveness, the Legislature was required to provide some

---

[21] *See Williams II*, 832 A.2d at 984 (holding that Megan's Law II as applied to SVPs is not excessive, at least not by the "clearest proof"); *Butler II*, 226 A.3d at 993; *cf. In re H.R.*, ___ A.3d ___,2020 WL 1542422 (Pa. Apr. 1, 2020).

means for a sexually violent predator to invoke judicial review in an effort to demonstrate that he no longer poses a substantial risk to the community." *Williams II*, 832 A.2d at 982-83. In Subchapter I, the General Assembly provided such a mechanism, but did not limit it only to SVPs. Thus, I consider how that mechanism impacts the excessiveness analysis.

Pursuant to 42 Pa.C.S. § 9799.59(a), an offender may petition a court to be exempted from the "requirement to register, the requirement to verify residence, employment and enrollment in an educational institution, the requirement to appear on the publicly accessible Internet website . . . and all other requirements." *Id.* The requirements are not easily met. For twenty-five years since his or her release from prison or since his or her last criminal conviction, the offender must demonstrate that he or she has not been convicted of any crime punishable by more than one year in prison. *Id.* § 9799.59(a)(1). The offender must be evaluated by the State Sexual Offenders Assessment Board, which must opine in writing as to whether it believes that the offender is likely to pose a threat to society if released from the requirements. *Id.* § 9799.59(a)(2)-(3). Thereafter, the trial court must hold a full hearing, affording counsel to the offender and the right to cross-examine any witnesses. *Id.* § 9799.59(a)(4). The reviewing court is vested with discretion to determine "only upon a finding of clear and convincing evidence" that the offender "is not likely to pose a threat to the safety of any other person." *Id.* § 9799.59(a)(5). If the petition is unsuccessful, the offender may reapply after five years have elapsed. *Id.* § 9799.59(a)(8).

This mechanism is a meaningful device for courts and offenders, but it does not sway my ultimate conclusion that Subchapter I is excessive. First, to reiterate, the focus of the instant analysis is not limited to this particular facet of the statute, but extends to the "entire statutory scheme." *Muniz*, 164 A.3d at 1218 (OAJC). It is obvious that the

mechanism is not available to all of those subject to Subchapter I. Because the removal provision can operate only after twenty-five years, ten-year reporters continue to have no means to prove to a court that they no longer require the supervision mandated by Subchapter I. For such offenders, the mechanism's existence contributes nothing to the question of Subchapter I's excessiveness.

Second, the mechanism provides only an opportunity to seek relief; such relief is far from a guarantee. The petitioner must make a compelling showing—indeed, by clear and convincing evidence—that, after a lengthy period of time, he or she is not likely to pose a threat to anyone. In this regard, the trial court still retains discretion to deny the petition. Additionally, the requirement is not limited to the threat that the offender will commit additional sexual offenses, nor is the potential threat limited to his or her original victim or to a similar person or age group. The court can exercise its discretion to deny the petition if it concludes that the offender may pose any threat to any person, in any circumstances, even if entirely unrelated to the goals articulated by the General Assembly in enacting this statutory scheme. I do not find the mechanism to be "illusory," as the trial court did in these cases, but I nonetheless am unable to ignore the high bar that it sets. The standard of proof, the court's discretion, and the broad showing of non-dangerousness required of the offender—the proof of a negative—make achieving relief exceedingly difficult, such that the mere potential for such relief does not mitigate the other aspects of Subchapter I that are excessive.

This factor weighs in favor of a finding that Subchapter I is punitive.

### vii. Balancing of the Factors; Conclusion

Balancing the five applicable *Mendoza-Martinez* factors is not a linear or formulaic exercise. The analysis requires more than a mere mathematical comparison of how many factors fall on each side of the equation. The factors never were intended to constitute a

rigid rubric meant to be mechanically applied exclusively to *ex post facto* claims. The factors actually "migrated into [the Supreme Court's] *ex post facto* case law" from its double jeopardy jurisprudence. *Smith*, 538 U.S. at 97. Regardless of origin, the factors are meant "to apply in various constitutional contexts." *Id.* For this reason, any assessment of the factors must be flexible in order to account for the particular constitutional challenge asserted. The factors shall be considered "neither exhaustive nor dispositive." *United States v. Ward*, 448 U.S. 242, 249 (1980). Each factor is only a "useful guidepost" in the exercise. *Smith*, 538 U.S. at 97 (quoting *Hudson v. United States*, 522 U.S. 93, 99 (1997)).

Because the General Assembly intended Subchapter I to be a civil scheme, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 100 (quoting *Ward*, 448 U.S. at 249). I would find that standard has been met.

There are significant differences between my analysis and that of the Majority. For instance, I would find that the first and seventh factor weigh in favor of finding the statute to be punitive, and I would include retribution as a relevant consideration with respect to the second factor. When I weigh the factors, it becomes apparent that the General Assembly has not created a scheme that, in its effects, is non-punitive. Like the OAJC in *Muniz*, I would find that Subchapter I: (1) imposes affirmative disabilities or restraints upon the subject offenders; (2) contains sanctions that historically have been considered to be punishment; (3) promotes the traditional punitive goals of deterrence and retribution; and (4) is excessive in relation to its stated purpose, even if only slightly. Each of these militates in favor of holding the entire scheme punitive.

Although no one factor is controlling, these findings collectively paint a clear picture of punitive effect. The impact that subjection to Subchapter I will have on an offender's

life cannot be understated. Compliance with the subchapter will be the defining feature of an offender's life for the duration of his or her statutory obligations, be it ten years or a lifetime. The offender must report yearly to an approved facility, differing little if at all from a probationer's visit with a probation officer. The offender is required to report to the PSP within three days any changes in the essential aspects of his or her existence. Although this obligation is less demanding than the more numerous in-person reporting requirements of earlier statutes, it nonetheless impacts the offender's life heavily, inasmuch as it creates a perpetual obligation that can never be neglected, lest severe penalties be inflicted for a single failure. At the same time, a significant amount of an offender's identifying information is posted online, and can be accessed readily or even automatically delivered to members of the public. This may impair an offender's ability to move into a community, to attend school, to find and keep gainful employment, and to remain crime-free without the threat of harassment or ostracism. Such control and monitoring differs little, if at all, from the situation of a convicted offender placed on probation. Indeed, as I explained above, it can result in penalties for non-compliance more severe than those a probationer would face for violating the terms and conditions of his or her sentence.

All told, the statutory enactment restrains the offender's liberty, resembles punishment, and is aimed at deterrence and retribution, resulting in a scheme that is excessive in relation to the lone factor weighing in the opposite direction, the existence of a rationally connected non-punitive purpose. I would deem this to be the "clearest proof" that is necessary to render the civil scheme punitive in effect.

I do not opine in any way upon the propriety or wisdom of the obligations imposed upon sexual offenders. That is neither my focus, nor my job. It may well be that the General Assembly's choices are necessary to achieve its goals, and essential to protect

society, as the Majority holds.  *See* Maj. Op. at 31-32.  That does not change the fact that those same choices created a punitive scheme that, when applied retroactively, amounts to an unconstitutional *ex post facto* law.  Consequently, as written, the statute must be invalidated.  Because the Majority holds otherwise, I respectfully dissent.

Justice Donohue joins the concurring and dissenting opinion.